918 P.2d 1206

The **IDAHO WATERSHEDS PROJECT, INC.**, Plaintiff–Appellant,

v.

**STATE BOARD OF LAND COMMIS- SIONERS**, Comprised of Phil Batt, Governor, Pete T. Cenarrusa, Secretary of State, Alan G. Lance, Attorney General, J.D. Williams, State Controller, and Anne C. Fox, Superintendent of Public Instruction, all in their official capacities, Defendants–Respondents.

No. 21774.

Supreme Court of Idaho, Boise, April 1996 Term.

June 20, 1996.

Debra Kronenberg, Ketchum, for appellant.

Alan G. Lance, Attorney General; Stephanie A. Balzarini, Deputy Attorney General (argued), Boise, for respondents.

McDEVITT, Chief Justice.

This case involves two competing applications to lease 640 acres of public land owned by the State of Idaho and located in Custer County. The public land in controversy is a section of land that was granted to the State of Idaho by the United States for the support of the common schools. The State Board of Land Commissioners (Board) was created by article IX, section 7 of the Idaho Constitution, for the purpose of directing, controlling, and disposing of such public lands of the State of Idaho. The appellant, the Idaho Watersheds Project, Inc. (IWP), is an Idaho non-profit corporation. IWP's purpose is to lease lands to protect and restore watersheds and riparian areas.

## I.

## FACTS AND PRIOR PROCEEDINGS

On September 23, 1993, William E. Ingram (Ingram), filed an application to renew his lease of 640 acres of public lands owned by the state with the Idaho Department of Lands (Department). On September 30, 1993, IWP timely filed an application with the Department to lease the same 640 acres of state public land.

On December 21, 1993, the Board held a meeting in which the conflicting applications of Ingram and IWP were discussed. During the December 21, 1993 meeting, Tracy Behrens, a range management specialist for the Department, advised the Board that: (1) Ingram currently leased 52 AUMs of state land on a state parcel in Custer County; (2) the lease expired December 31, 1993; (3) both Ingram and IWP filed timely applications to lease the 640 acres; (4) the 640 acres was grazed in conjunction with the Herd Creek Cattle and Horse Allotment Management Plan (Plan), which was administered by the BLM[1]; (5) IWP's intent in acquiring the lease was to fence off the riparian area to improve the habitat for the salmon; (6) IWP submitted an affidavit, through IWP's president, Jon Marvel, stating that IWP had received a copy of the Plan and would comply with the Plan; and (7) the BLM's response to IWP's attempt to lease and fence off a portion of the 640 acres was that as long as fencing was restricted to the south side of the Herd Creek Road, there would be no substantial impact on the overall management of the allotment. Behrens informed the Board that the Department's recommendation was that both lease applications be accepted and the Department proceed with an auction.

During the Board's December 21, 1993 meeting, Jon Marvel addressed the Board on behalf of IWP. Marvel explained that Lake Creek, that runs through the 640 acres of state public land, provides spawning habitat for the threatened Chinook salmon, and if IWP was successful in acquiring the lease of the 640 acres, IWP would propose to fence one mile of Lake Creek south of the Herd Lake road to exclude livestock. Marvel represented to the Board that IWP would abide by the Plan. Marvel provided the Board with letters from the Forest Service and the BLM that indicated IWP's plans would not interfere with the administration of the Plan. Marvel concluded requesting a conflict auction for the lease of the 640 acres of state public land.

Ingram's attorney responded that Ingram disagreed that IWP's plan would not interfere with the administration of the Plan. The Board was advised by Ingram's attorney that the 640 acre lease was a valued part of Ingram's ranching operation, but that the economic reality was that Ingram could not justify paying an increased fee for the grazing lease, and that Ingram would not participate in the bidding process, at least with any great variation from what Ingram was currently paying.

The Board voted to instruct the Department to hold a conflict auction, pursuant to the mandate of section 58–310 of the Idaho Code. On January 11, 1994, the Department

---

1. During the Board's February 8, 1994 meeting, Gary Ingram (William Ingram's son) informed the Board that he believed the Forest Service was the lead agency for the Plan. Marvel agreed with Gary Ingram that the Forest Service was the lead agency for the Plan.

notified Ingram and IWP by certified mail that the Department would be conducting a lease auction for the 640 acres, pursuant to I.C. § 58–310, on Friday, January 28, 1994, at 11:30 a.m. at the Department's office in Idaho Falls. The purpose of the auction was to settle the conflict over the two parties' lease applications for Section 16, Township 9 North, Range 19 East, B.M. for 52 AUMs.

On January 12, 1994, Ingram attempted to appeal the decision to hold a conflict auction. The Department rejected Ingram's appeal, on the basis that Ingram did not have a right to appeal the conflict auction until after the auction was held and if Ingram was aggrieved in some manner by the proceedings.[2]

On January 26, 1994, the Department sent a letter to Ingram and IWP, confirming that the conflict auction would take place at 11:30 a.m. on January 28, 1994, at the Department's Idaho Falls office. The January 26, 1994 letter, from the Department, also informed Ingram and IWP that all relevant issues and administrative appeals would be considered during the Board's February meeting.

The conflict auction took place on January 28, 1994. Both Ingram and IWP appeared at the auction. Ingram did not make a bid and IWP made the sole bid of $30.00.

On February 4, 1994, Ingram appealed the auction and award of the lease to IWP. Ingram's grounds for appealing the conflict auction were: (1) The Board members did not understand the significance of the 640 acres of state public land relative to Ingram's overall use of the entire allotment; (2) the Board members were not provided the Plan that specifically stated that the Plan would not work unless BLM and state sections were incorporated to form units; (3) IWP's fencing plan would cause extreme and undue degradation to the state land grazing resource as well as the adjoining BLM lands; and (4) that the Ingram family ranch was a long-term, stable, and contributing factor to the local economy.

On February 7, 1994, the BLM sent Ingram a letter, regarding the BLM's previous letter to Jon Marvel dated December 13, 1993. The BLM's February 7, 1994 letter, informed Ingram that the BLM had reversed its prior opinion, regarding IWP's proposal to fence a portion of Lake Creek on the 640 acres of state public land. After hearing Ingram's detailed explanation, the BLM agreed that a fence on the 640 acres of state public land would create a difficult situation; an increased concentration of livestock around the fence would no doubt create negative impacts on BLM lands and consequently substantially impact the management of the Herd Lake Unit of the Allotment. On February 7, 1994, the Department sent Ingram a letter that restated the Department's continuing belief that the fence proposed by IWP would not pose a serious management impact to the allotment.

On February 8, 1994, the Board determined that the lease of the 640 acres of state public land would go to Ingram. The Board's decision was based upon the long standing lease relationship Ingram had with the Board and that the 640 acres was a part of a larger grazing allotment covered by a multi-agency grazing management plan. Ingram was granted a ten year lease of the 640 acres.

On March 8, 1994, IWP timely appealed to the district court the decision of the Board awarding Ingram the lease for the 640 acres. On March 24, 1994, the district court issued an order concluding that, pursuant to I.R.C.P. 83(u) and I.A.R. 34, the district court would determine IWP's appeal upon the record and not as a trial de novo.

On October 25, 1994, the district court affirmed the decision of the Board. IWP appealed the Board's decision to this Court.

## II.

### STANDARD OF REVIEW

■ Idaho Code § 67–5279 states this Court's standard of review when reviewing a

---

2.  IDAPA 20.03.14.003.1 provides that, "[a]n aggrieved party desiring to make such an appeal shall within twenty (20) days after receiving notice of the final decision, which is being appealed or in case of a conflict auction after the auction is held, file with the director a written notice of appeal setting forth the basis for the appeal."

decision of the Board.[3] Idaho Code § 67–5279 applies when the Court is reviewing a decision of an "agency." An "agency" is defined as "each state board, commission, department or officer authorized by law to make rules or to determine contested cases...." I.C. § 67–5201(2). The Board is an "agency" as defined by I.C. § 67–5201(2) and the Rules of Practice and Procedure Before the State Board of Land Commissioners.[4]

■ Idaho Code § 67–5279 provides that this Court is not to substitute its judgment for that of the Board as to the weight of the evidence on questions of fact. I.C. § 67–5279(1). The Court must affirm the Board's action unless the Court determines that the Board's findings, inferences, conclusions, or decisions, are:

(a) in violation of constitutional or statutory provisions;

(b) in excess of the statutory authority of the agency;

(c) made upon unlawful procedure;

(d) not supported by substantial evidence on the record as a whole; or

(e) arbitrary, capricious, or an abuse of discretion.

I.C. § 67–5279(3). This Court must affirm the Board's decision unless substantial rights of the appellant have been prejudiced. I.C. § 67–5279(4).

## III.

### THE BOARD ACTED OUTSIDE ITS CONSTITUTIONAL AND STATUTORY AUTHORITY BY GRANTING THE LEASE TO INGRAM

■ IWP contends that the Board violated article IX, section 8 of the Idaho Constitution by leasing the 640 acres of state public land without requiring a competitive bid for the lease of the state public land. IWP argues

that a party must actually place a bid at a conflict auction, in order to be considered a qualified applicant for a lease of state public lands. We agree.

Article IX, section 8 of the Idaho Constitution describes the Board's duties as follows:

> It shall be the duty of the [Board] to provide for the location, protection, sale or rental of all the lands ... in such manner as will secure the maximum long term financial return to the institution to which granted or to the state ·if not specifically granted; provided, that no state lands shall be sold for less than the appraised price.

Article IX, section 8 defines the legislature's authority as follows:

> The legislature shall, at the earliest practical period, provide by law that the general grants of land made by congress to the state shall be judiciously located and carefully preserved and held in trust, subject to disposal at public auction for the use and benefit of the respective object for which said grants of land were made....

IWP argues that the Court's holding in *East Side Blaine County Livestock Ass'n v. State Bd. Land Comm'rs*, 34 Idaho 807, 198 P. 760 (1921), should be applied in this case. The issue in *East Side* was whether school land leases had to be offered at a public auction, pursuant to Idaho's constitutional and statutory mandate. *East Side*, 34 Idaho at 812, 198 P. at 762. The *East Side* Court held that state school lands are to be "leased at public auction to the highest bidder therefor." *East Side*, 34 Idaho at 814, 198 P. at 762. The *East Side* Court further held that "[t]he dominant purpose of these provisions of the constitution and of the statutes enacted thereunder is that the state shall receive the greatest possible amount for the lease of school lands for the benefit of school funds,

---

3. The Board has recognized that judicial review ·of Board decisions is governed by the Idaho Administrative Procedures Act. The Board's Rules Governing Grazing Leases and Cropland Leases state that, "[j]udicial review of the final decision of the Board shall be in accord with the Administrative Procedure Act, Title 67, Chapter 52, Idaho Code". IDAPA 20.03.14.003.03.

4. An "agency" is defined by the Rules of Practice and Procedure Before the State Board of Land Commissioners as "[t]he state board of land commissioners and the Idaho department of lands." IDAPA 20.01.01.005.02.

and for this reason competitive bidding is made mandatory." *Id.*

The Board is granted broad discretion in determining what constitutes the maximum long term financial return for the schools. Idaho Const. art. IX, § 8. Idaho Code § 58–310 states that the Board "shall have power to reject any and all bids made at such auction sales, when in their judgment there has been fraud or collusion, or for any other reason, which in the judgment of said [Board] justified the rejection of said bids. . . ." In *Barber Lumber Co. v. Gifford,* 25 Idaho 654, 139 P. 557 (1914), the Court upheld the Board's decision to award a timber sale to the lower dollar bidder. The Court held that:

> From all of the facts in this case, it is clear that the board did not exceed its discretion in making said sale, and as held in *Pike v. State Board of Land Commissioners* [19 Idaho 268, 113 P. 447 (1911)]. . ., said board is the trustee or business manager for the state in making the sale of said timber and on matters of policy, expediency and business interest of the state, they were the sole and exclusive judges, so long as they did not run counter to the provisions of the constitution or statute and no fraud was shown.
>
> Under the law and the facts of this case, the board had the discretionary power to reject the bid made by Snow and accept the bid made by the Barber Lumber Co.

*Barber,* 25 Idaho at 671, 139 P. at 562–63.

In the present case, the Board contends its decision to grant the lease to Ingram was within its discretionary powers and should be upheld. The Board relies upon a Department policy that does not require a former lessee to place a premium bid at a conflict auction, in order for the former lessee to maintain the status quo and its lease of the state public land. The Department's policy presumes, in effect, that a former lessee placed a premium bid, despite the fact that the former lessee has not placed a premium bid, above the former lessee's previous rental rate, at a conflict auction. The Department's policy does not require a former lessee to place a premium bid at a conflict auction, in order to remain qualified to receive the lease of state public land.

IWP responds arguing that any conflicting applicant for a lease of state public land must place a bid at a conflict auction, in order to be qualified to receive a lease of state public land, pursuant to I.C. § 58–310.

In *Balderston v. Brady,* 17 Idaho 567, 107 P. 493 (1910), the Court considered the scope of the Board's authority:

> The authority for such an act cannot be found in either the constitution or statute. It is, therefore, perfectly safe to say that no such power exists. We have hereinbefore said that the board must act under the law. *It must find authority in the constitution and statute for its acts. No such authority as claimed exists,* and it is clear that the state land board has no power to relinquish or surrender the right or title of the state of Idaho to any of its school lands.

*Balderston,* 17 Idaho at 585, 107 P. at 499 (emphasis added). In *Tobey v. Bridgewood,* 22 Idaho 566, 127 P. 178 (1912), *overruled on other grounds by Idaho–Iowa Lateral & Reservoir Co. v. Fisher,* 27 Idaho 695, 151 P. 998 (1915), the Court held that the Board had improperly granted the appellant a deed of conveyance of state land perpetually for a reservoir site, without such land being obtained by purchase at a public auction. *Tobey,* 22 Idaho at 580, 127 P. at 183. The Court stated the following with regard to the Board's action:

> The question of policy and business expediency which may have been pursued by the state board in the past, and which might be pursued in the future, should not control or guide this court in upholding and sustaining a policy, where such policy is *absolutely prohibited by the provisions of the constitution and the laws of this state.* The constitution and laws of the state should at all times be followed and upheld and sustained by the courts, and should not be ignored by public officers in the administration of public affairs of the state.

*Tobey,* 22 Idaho at 584, 127 P. at 184–85 (emphasis added).

The issue before the Court in this case is whether it was within the Board's discretion to grant the lease to Ingram. Idaho Code § 58–310 is the statutory provision that applies to situations where there are two competing applications filed to lease the same state public land. Idaho Code § 58–310 provides the Board with discretion to reject any bid, for any reason. However, I.C. § 58–310 does not address the situation where the Board has rejected the sole bid placed at a conflict auction, and then granted the lease to a person who appeared, but did not bid, at the conflict auction.

The legislative policy for granting leases when two persons have applied for the same lease, is stated in I.C. § 58–310. Idaho Code § 58–310 specifically states that, "[w]hen two (2) or more persons apply to lease the same land, the director of the department of lands, or his agent, *shall*, at a stated time, and at such place as he may designate, *auction* off and lease the land to the applicant who will pay the highest premium bid therefor." I.C. § 58–310 (emphasis added). The Board's ability to reject any bid is broadly stated:

> [the Board] shall have power to reject any and all bids made at such auction sales, when in their judgment there has been fraud or collusion, or for any other reason, which in the judgment of said [Board] justified the rejection of said bids....

I.C. § 58–310.

It is undisputed that Ingram did not place a bid and that IWP placed the sole bid at the conflict auction on January 28, 1994. Ingram inquired at the conflict auction whether Ingram was considered to have participated by appearing at the auction, even though Ingram was not going to bid. An employee of the Department of Lands (Department), responded that, "[i]t has always been held that way. You need to realize there are all kinds of fields of administrative review of what's going on. I can't say, I'll let you make that decision." The employee further stated that

> the question we asked early in the auction was your intent to keep your right for application participate [sic] open. You indicated that intent. There is a rule that is written that says applicants must show up and actually participate in the bidding—

but previous lease auctions, we've sometimes had people make a bid for several thousand dollars on the opening bid and put everybody out and we have always considered those other parties as having participated in the auction so I think the precedent is set that way—but I don't want to make you feel that's the absolute legal answer.

Ingram then stated that he was not going to bid.

The Board must find authority in the constitution and statutes for its actions. *Balderston*, 17 Idaho at 585, 107 P. at 499. No such authority exists to support the Board's act of granting the lease to a person who did not place a bid at the conflict auction. Idaho Code § 58–310 requires an auction be held where, as in this case, there are two persons who have applied to lease the same state school land. The Board's assertion that it has a policy of granting a lease to a prior lessee at the previous leasing rate, despite the fact that the prior lessee did not place a bid at a conflict auction, is contrary to the legislative mandate set forth in I.C. § 58–310, that states the Department "shall" conduct an "auction" and lease the land to the highest premium bid. The rationale behind the requirement of conducting an "auction" is to solicit competing bids, with the lease being granted to the bid that would, in the discretion of the Board, "secure the maximum long term financial return" to Idaho's schools. Idaho Const. art. IX, § 8. The Board does not have the discretion to grant a lease to an applicant who does not place a bid at an auction, based upon Idaho's constitutional and statutory mandate that the Board conduct an auction. Idaho Const. art IX, § 8; I.C. § 58–310.

As this court stated in *Tobey*, "[t]he constitution and laws of the state should at all times be followed and upheld and sustained by the courts, and should not be ignored by public officers in the administration of public affairs of the state." *Tobey*, 22 Idaho at 584, 127 P. at 184–85. The Board did not have the discretion to grant the lease to Ingram, given Ingram failed to place a bid at the conflict auction. To hold otherwise would be contrary to the purpose of I.C. § 58–310; to

conduct an "auction" and grant the lease to the bidder who, in the discretionary judgment of the Board, would secure the maximum long term financial return to Idaho's schools. Idaho Const. art IX, § 8; I.C. § 58–310. We reverse the decision of the Board and remand this case for action consistent with this opinion.

## IV.

### IWP IS NOT ENTITLED TO ATTORNEY FEES ON APPEAL

IWP's opening appellate brief does not comply with I.A.R. 35(5), which requires the appellant's brief contain a division, with an appropriate heading, indicating the appellant is requesting attorney fees. Rule 35(5) of the I.A.R. states that:

> If the appellant is claiming attorney fees on appeal the appellant must so indicate in the division of issues on appeal that appellant is claiming attorney fees and state the basis for the claim.

In *State v. Prestwich*, 116 Idaho 959, 783 P.2d 298 (1989), *overruled on other grounds by State v. Guzman*, 122 Idaho 981, 842 P.2d 660 (1992), we held that while the Court will not consider issues not raised in the statement of issues on appeal, the Court will relax this rule and consider issues that have been addressed by authorities cited or arguments contained in the briefs. *Prestwich*, 116 Idaho at 961, 783 P.2d at 300. IWP presented argument and authority in support of its request for attorney fees in its opening appellate brief and reply brief.

IWP argues that an award of attorney fees under I.C. § 12–117 is appropriate, since the Board is an "agency" under I.C. § 67–5201(2), IWP is a "person" under I.C. §§ 67–5201(13) and 12–117(4)(a), the Board acted with an unreasonable basis in fact or law when it granted the lease to Ingram, and the Board acted pursuant to unpublished rules and acted beyond the bounds of its statutory authority.

The Board contends that I.C. § 12–117 cannot support an award of attorney's fees because the Board acted on the basis of its long-standing interpretations of applicable constitutional and statutory provisions and administrative rules.

■ The Board acted with a reasonable basis in law in rejecting IWP's bid. Attorney fees pursuant to I.C. § 12–117, are not appropriate in this case.

■ IWP argues that it is entitled to attorney fees under I.C. § 12–121 based upon this action falling into a "hybrid" category, since IWP filed an appeal from the Board's decision and a writ of mandate with the district court. IWP also requests an award of attorney fees under the private attorney general doctrine. The Board is an "agency" and the test is one of its "reasonableness" in its action under I.C. § 12–117 to the exclusion of I.C. § 12–121. *See Lowery v. Bd. County Comm'rs*, 117 Idaho 1079, 1081–82, 793 P.2d 1251, 1253–54 (1990).

■ As to the claim of IWP under the private attorney general doctrine, this issue was decided by this Court in *Roe v. Idaho Dep't of Health & Welfare*, 128 Idaho 569, 917 P.2d 403 (1996) :

> Comparing the private attorney general doctrine with I.C. § 12–117, the private attorney general doctrine considers the value of the prevailing party's contribution, while I.C. § 12–117 considers the character of the losing party's case. This difference evidences a legislative intent to make the standard of I.C. § 12–117 the basis for an attorney fee award against a state agency, rather than the tests encompassed under the private attorney general doctrine. This legislative intent causes us to rule that the private attorney general doctrine is not available as the basis for an award of attorney fees in a case against a state agency.

*Roe*, 128 Idaho at 573, 917 P.2d at 407.

## V.

### CONCLUSION

We reverse the decision of the Board and remand this case for action consistent with

this opinion. No attorney fees on appeal. Costs to the appellant.

JOHNSON, SILAK and SCHROEDER, JJ., and SWANSTROM, J. Pro Tem., concur.